*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ZAIRE BARRY VAUGHN,

        Defendant-Appellant.

UNPUBLISHED
August 29, 2024

No. 364614
Wayne Circuit Court
LC No. 21-000374-01-FC

Before: MURRAY, P.J., and BORRELLO and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of second-degree murder, MCL 750.317; reckless driving causing death, MCL 257.626(4); operating a motor vehicle while license suspended, revoked, or denied causing death, MCL 257.904(4); reckless driving causing serious impairment of a body function, MCL 257.626(3); operating a motor vehicle while license suspended, revoked, or denied causing serious impairment of a body function, MCL 257.904(5); and first-degree fleeing or eluding a police officer causing death, MCL 750.479a(5).[1] Defendant was sentenced to concurrent terms of 30 to 80 years' imprisonment for second-degree murder, 5 to 15 years' imprisonment for reckless driving causing death, 5 to 15 years' imprisonment for operating without a license causing death, 2 to 5 years' imprisonment for reckless driving causing serious impairment of a body function, 2 to 5 years' imprisonment for operating without a license causing serious impairment of a body function, and 5 to 15 years' incarceration for first-degree fleeing or eluding a police officer causing death. Discerning no errors warranting relief, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 4:43 p.m. on August 1, 2020, defendant drove through a red light at an extremely high rate of speed while fleeing from the police and struck the victim's vehicle, killing the victim and severely injuring one of her three children who were in the backseat. A police

---

[1] Defendant was acquitted of carrying a concealed weapon (CCW), MCL 750.227, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

officer testified that, just minutes prior, he and his partner saw a burgundy Dodge Challenger and a red and black Dodge Charger drag racing at a very high rate of speed on Seven Mile Road. The officers also recognized the Challenger from a prior unresolved investigation. To minimize risk to pedestrians in the area, the officers followed the cars in their marked police car—without sirens or lights on—into the parking lot of a gas station on the corner of East Seven Mile Road and Chalmers Street.

The officer further testified that as he parked next to the Dodge Challenger, the driver got out and walked into the gas station, but the individual in the front passenger seat, who was later identified as defendant, remained in the car with the windows rolled down. The officers then approached the car and, as they did so, defendant tucked his head down and began "digging underneath the passenger seat." The officers drew their guns as they continued to approach, identified themselves as police officers, and instructed defendant to stop what he was doing and to show them his hands. The officers were not wearing a standard police uniform at that time but were wearing a vest marked "Police." Defendant then looked at the officers "dead in the eyes," jumped over the center console and into the driver's seat, and fled the gas station.

The officer testified that defendant initially lost control of the car from how hard he pressed on the gas pedal and "started doing doughnuts," but he eventually regained control of the car and began traveling south on Chalmers Street. The officers remained at the gas station to detain the original driver, but they provided dispatch a description of the Challenger and informed them that defendant had fled the gas station and was driving southbound on Chalmers Street at a high rate of speed. Another police officer testified that as he patrolled the area for the Challenger, he was immediately informed by dispatch that there was a car crash involving that car less than a mile from the gas station at the intersection of Chalmers Street and Seymour Street.

The victim's eldest daughter, who was 12 years old at the time of the crash, testified that she and her two younger siblings were riding in the backseat of the victim's car when another car suddenly hit them and spun their car around. As a result of the crash, the victim's daughter hit her head on the back of the driver's seat and broke her right arm. A motorist on the roadway who had witnessed the crash testified that she was waiting for a black Chevy Trailblazer to pass the intersection so that she could turn left from Seymour Street onto Chalmers Street when a burgundy Challenger ran the red light on Chalmers Street at a high rate of speed and crashed into the side of the Trailblazer. The motorist recalled hearing the Challenger's motor as it approached the intersection and believed that it was traveling much faster than the posted 30-mile-per-hour speed limit. A police sergeant who investigates fatal car crashes testified that he analyzed the event data recorder in the Challenger and determined that car's speed fluctuated between 78 and 85 miles per hour during the five seconds before the crash and that the car was traveling at 82 miles per hour when it struck the victim's car.[2]

Video footage of the crash captured by cameras on nearby buildings was also played for the jury. The videos showed the motorist waiting for the victim to pass the intersection so that she

_____

[2] The police sergeant testified on behalf of the prosecution as an expert in the "field of event data recorder recovery and event data interpretation."

could turn left from Seymour Street onto Chalmers Street. As the victim entered the intersection, defendant ran the red light on Chalmers Street and crashed into the front-passenger side of the victim's car at a very high rate of speed. Both cars spun out and were completely destroyed from the impact. Defendant's car subsequently slammed into a utility pole, knocking it down. The county's chief medical examiner testified that an autopsy of the victim revealed that she had suffered significant internal and external injuries as a result of the car crash and that, given the severity of the injuries, she died on impact.[3]

The patrolling officer testified that he arrived at the crash scene at approximately 4:45 p.m. The patrolling officer's body-worn camera had recorded the entire series of events, and the 38-minute video was played for the jury in small increments throughout the patrolling officer's testimony.[4] In the video, the patrolling officer immediately saw the victim's Trailblazer and the Challenger, both of which had been completely destroyed, and he asked nearby individuals if they were injured. Bystanders near the Challenger pointed out defendant, who was trapped behind the driver's seat of the car with one leg over the seat and the other lodged between the center console and the seat. The officer also saw the victim lying in the middle of Chalmers Street and her three children standing on the sidewalk nearby. All of the children were crying and appeared scared. Given the state of defendant, the victim, and the victim's children, the officer called for multiple emergency medical services (EMS), and he continued to assess the scene to determine what had occurred. The officer then approached the victim in the street, who was unresponsive and bleeding from her nose and mouth. As he assessed the victim's injuries and checked her for a pulse, the children and other bystanders informed him that the victim had been ejected from her car during the crash. The children could be heard crying in the background as the officer continued to interview bystanders and secure the scene near the victim but, within one to two minutes, the children were escorted away from the area by other officers. After the officer assisted EMS with the victim, he returned to the Challenger to assist in safely removing defendant, who was bleeding and fading in and out of consciousness. Defendant was eventually removed from the vehicle and transported to the hospital.

The patrolling officer further testified that, during his preliminary search of the Challenger immediately after securing the crash scene, he recovered a firearm from under the front passenger seat of the car, all of which was reflected by footage from his body-worn camera.[5] The lead investigating detective testified that he subsequently ran a search of the Challenger's license plate

---

[3] The medical examiner testified on behalf of the prosecution as an expert in the fields of forensic pathology and anatomical pathology.

[4] Upon prior agreement of the parties, several portions of the audio were muted throughout the video because there were references to defendant's "alleged criminal behavior." When the video was admitted into evidence during the patrol officer's testimony, a limiting instruction was given to the jury explaining that the parties and the trial court agreed to mute those portions of the audio "in order to ensure a fair trial" because the statements were either "not relevant or violate[d] the rules of evidence."

[5] The footage of the officer recovering the firearm was admitted into evidence as a separate exhibit from the footage depicting his initial response to the crash scene.

and learned that it had recently been reported stolen by a neighboring police department. A driver assessment analyst of the Secretary of State testified that, based on defendant's driving record, defendant's license was suspended at the time of the crash.

Defendant testified on his own behalf, focusing on the core theory of his defense: the car crash was purely accidental because he fled out of fear for his own life and was unable to recognize that his actions would likely cause death or great bodily harm. Defendant admitted that he did not own the Challenger and did not have a valid driver's license at the time that he drove it, but he maintained that he fled in the car because he was afraid for his life. Defendant explained that while he was waiting in the Challenger at the gas station, he saw "a stranger . . . approaching with a gun aimed at [his] head" and "instantly panicked," so he jumped into the driver's seat and sped off to avoid being shot. Defendant stated that he did not see a police car or hear any sirens, so he did not realize that the men approaching him were police officers. Defendant further stated that he initially did not recall driving the Challenger or hitting the victim's car after he regained consciousness in the hospital and that when a nurse told him about the crash, he "began to break down crying." Defendant testified that his memory of the crash returned "three to five days later," and he "cried for months straight" because he "never meant to hurt [the victim] or cause her death."

Defendant was convicted and sentenced as previously described. This appeal followed.

## II. VIDEO EVIDENCE

Defendant argues that his constitutional due-process right to a fair trial was denied when the trial court improperly admitted the body-camera footage depicting the aftermath of the crash because it was irrelevant to prove the necessary elements of the charged offenses and was overly prejudicial. This issue is unpreserved because defendant failed to object to the admission of the video at trial. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2019) (quotation marks and citation omitted). The defendant bears the burden of persuasion and, to obtain appellate relief, must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To satisfy the third element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. And even when these three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citation omitted).

We do not see plain error in the trial court's admission of the challenged body-camera footage. Evidence must be relevant to be admissible at trial. See MRE 402.[6] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination

---

[6] Our Supreme Court revised the Michigan Rules of Evidence effective January 1, 2024. We cite the version of the rules that were in effect at the time of defendant's trial.

of the action more probable or less probable than it would be without the evidence." MRE 401. "Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Even if relevant, however, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). "It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *Id.*

Due process requires the prosecution to prove every element of a charged offense beyond a reasonable doubt. *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021). Thus, to prove that defendant committed second-degree murder, the prosecution was required to prove that there was "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (quotation marks and citation omitted). "Malice" may be established by showing that a defendant intended "to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* A jury may infer malice "from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Bailey*, 330 Mich App 41, 48; 944 NW2d 370 (2019) (quotation marks and citation omitted).

The body-camera footage in this case demonstrated that the victim was driving the Trailblazer, that the Challenger struck the Trailblazer, that defendant was the sole occupant of the Challenger that struck the Trailblazer, that the Challenger was moving at a very high rate of speed at the time of the collision, that the victim was ejected from her Trailblazer when she was struck by the Challenger, and that both cars were extensively damaged. The evidence was thus relevant to establishing the necessary elements of the charged offenses, including that defendant's actions caused the victim's fatal injuries and the dangerous manner in which defendant had been driving. See *Gafken*, 510 Mich at 511; *Bailey*, 330 Mich App at 48; see also *Aldrich*, 246 Mich App at 114 (explaining that "evidence regarding the condition of the . . . vehicle [struck by the defendants] was relevant to the jury's determination of facts at issue in this case such as defendants' recklessness or carelessness and the speed of the vehicles at the time of the impact").

Defendant argues that witness testimony was sufficient to establish all of the necessary elements of the charged offenses and the body-camera footage was "overkill," and he takes particular issue with the fact that the video shows the victim lying in the street and that the victim's children can be heard crying in the background. As noted, however, the prosecution had the burden at trial to prove every element of the charged offenses beyond a reasonable doubt, *Smith*, 336 Mich App at 308, and, in seeking to carry that burden, it was permitted to present corroborative evidence to provide the jury with a complete picture of what had occurred, see, e.g., *Aldrich*, 246 Mich App at 115 (holding that "a jury is entitled to hear the 'complete story' of the matter in issue" and that the jury would have been perplexed "to learn that a violent two-car collision had occurred but not what became of the occupants of one of the vehicles") (citation omitted); *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009) (noting that a jury is "entitled to view the severity and vastness of the injuries for itself" and that photos "may properly be used to corroborate other evidence and are not excludable simply because they are cumulative of a witness's oral

testimony"). The video, which was presented in short increments throughout the patrolling officer's testimony, presented the crash scene as it appeared to the patrolling officer immediately after his arrival and throughout his preliminary investigation. The video also specifically corroborated testimony concerning defendant's speed at the time of the crash, how the crash had occurred, the nature and extent of the victim's fatal injuries, and her ultimate cause of death.

And while the footage may have been prejudicial to defendant, we cannot conclude that it was so unfairly prejudicial as to substantially outweigh its probative value. See MRE 403; *People v Baskerville*, 333 Mich App 276, 287-288; 963 NW2d 620 (2020). The footage and accompanying audio may have evoked an emotional response, but relevant evidence "is not inadmissible merely because it may arouse emotion." *Baskerville*, 333 Mich App at 289. "Rather, MRE 403 excludes only *unfairly* prejudicial evidence, meaning there is a serious danger that the jury would give evidence with relatively little logical relevance undue weight or that the evidence would tend to arouse the jury's emotions to a degree that would preclude proper consideration of the actual merits of the case." *Id*. at 287-288. As noted, the video was probative of many material facts and, although aspects of it may have been disturbing to view, defendant has not shown a "serious danger" that its content would have "preclude[d] proper consideration of the actual merits of the case." *Id*. Defendant, for instance, stresses the presence of the victim's children in the video, but they were themselves involved in the crash (indeed, defendant was also charged for the injuries suffered by the victim's eldest child) and, furthermore, they were entirely removed from the crash scene within a few minutes of the officer's arrival and could not be seen or heard in the video beyond that point. Moreover, it generally bears noting that the parties and trial court took steps at trial to limit what they identified as potential undue prejudice from the footage, agreeing to mute portions of its audio and to instruct the jury that this had been done "in order to ensure a fair trial" because the statements were either "not relevant or violate[d] the rules of evidence." In sum, we cannot say that the evidence was so prejudicial as to be inadmissible despite its probative value, let alone that the court, in admitting the evidence, committed plain error warranting reversal. See *Allen*, 507 Mich at 613-614.

## III. PROSECUTORIAL MISCONDUCT

Defendant argues that he was denied a fair trial because the prosecution committed multiple instances of misconduct during trial. Defendant did not contemporaneously object or request a curative instruction for any of the alleged prosecutorial misconduct, so we review this unpreserved issue for plain error affecting substantial rights. See *People v Evans*, 335 Mich App 76, 88-89; 966 NW2d 402 (2020). Claims of prosecutorial misconduct are reviewed on a case-by-case basis by examining pertinent portions of the record and evaluating "the prosecutor's remarks in context." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). Prosecutors are generally accorded "great latitude regarding their arguments and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *Id*. (quotation marks and citation omitted).

Defendant argues in his supplemental Standard 4 brief[7] that the prosecution's closing argument was improperly based on facts that were not in evidence. Specifically, defendant takes issue with the prosecution's remark in its closing argument, "It was his gun." Defendant was charged with carrying a concealed weapon (CCW), MCL 750.227, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, so the prosecution was necessarily required to argue that defendant concealed a firearm and possessed a firearm at the time that he committed the other charged felonies. The patrolling officer testified that he found a gun under the driver's seat of the Challenger after securing the crash scene, which was reflected in the footage from his body-worn camera, and investigating detectives testified that defendant had recently purchased a firearm and had taken pictures with it. A purchase receipt and photos from defendant's social media reflecting this were also admitted into evidence. The record makes clear that the prosecution's remark was based on this admitted evidence. As a result, the prosecution properly argued facts in evidence. See *Mullins*, 322 Mich App at 172. Regardless, the jury acquitted defendant of all firearm-related charges, so defendant did not suffer any prejudice, and reversal is not warranted on this issue. See *Allen*, 507 Mich at 614.

Defendant also argues in his brief on appeal and in his Standard 4 brief that the prosecution made improper pleas to the jury's sympathies, emotions, and sense of civic duty during closing argument and rebuttal by stating that "it could have been any one of us at that intersection at Seymour and Chalmers" and urging the jury to hold defendant "accountable" and "give [the victim's] family the justice that they deserve" by convicting him of second-degree murder. Relatedly, defendant argues in his Standard 4 brief that the prosecution improperly expressed its personal beliefs regarding his guilt by stating that it would be "wholly preposterous" to find that his conduct was merely an accident, as defendant "made a series of conscious decisions in this case" and "[t]his was 100 percent avoidable" and "not an accident."

"A prosecutor may not appeal to the jury to sympathize with the victim" or "urge the jury to convict as part of its civic duty or on the basis of its prejudices." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). By doing so, the prosecution improperly "inject[s] issues broader than the guilt or innocence of the accused" into the trial rather than "asking the jury to convict on the basis of evidence produced at trial." *People v Bahoda*, 448 Mich 261, 284-285; 531 NW2d 659 (1995) (quotation marks and citation omitted). When the prosecution, however, argues that the charged offense has been established beyond a reasonable doubt, such "remarks do not constitute an assertion of personal belief by the prosecutor in defendant's guilt or an argument that the jury should convict the defendant regardless of the evidence." *People v Matuszak*, 263 Mich App 42, 56; 687 NW2d 342 (2004).

While the propriety of some of the prosecution's remarks, taken in isolation, might have been questionable, we cannot conclude they amounted to plain error affecting substantial rights. See *Evans*, 335 Mich App at 88-89. The prosecution in this case did not simply argue that the jury should convict defendant to hold him accountable for causing the victim's death. Rather, the prosecution's remarks, when viewed as a whole and in context, were duly tied to its arguments

---

[7] Defendant filed a supplemental Standard 4 brief pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

that, based on all of the evidence presented at trial, it had proven all of the necessary elements of second-degree murder beyond a reasonable doubt and that a conviction on that charge was therefore appropriate. See *Matuszak*, 263 Mich App at 56. The prosecution similarly argued that, given the strength of the evidence proving the necessary elements of second-degree murder, it was "wholly preposterous" to conclude that the victim's death was simply the result of an accident— i.e., the victim's death occurred because defendant did not realize that intentionally driving over 80 miles per hour in a 30-mile-per-hour speed zone would likely cause great bodily harm or death—as defendant argued in his closing argument. See *id*.; see also *People v Fyda*, 288 Mich App 446, 462; 793 NW2d 712 (2010) (holding that "[t]he fact that the prosecutor employed colorful rhetoric" when addressing the weaknesses of a defense theory during closing arguments "does not make the response to [the defendant's] arguments disproportionate"). Indeed, prior to making these arguments, the prosecution reiterated all of the presented evidence at length to show that it had sufficiently proven each element of the charged offense as it is required to do. See *Smith*, 336 Mich App at 308. Furthermore, any prejudice caused by the prosecution's remarks was ameliorated by the trial court's instructions to the jury that it had to decide the case solely based on the evidence presented, that the attorneys' arguments were not evidence, and that it could not let sympathy or prejudice influence its decision. See *People v Thomas*, 260 Mich App 450, 456; 678 NW2d 631 (2004). Reversal is therefore not warranted on this issue. See *Allen*, 507 Mich 614.[8]

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his Standard 4 brief, defendant also argues that his trial counsel was ineffective for (1) failing to object to the prosecution's improper remarks, (2) failing to consult or call an expert witness to address defendant's state of mind before and during the crash, and (3) generally failing to investigate the case, particularly as it related to the necessity of an expert witness. Whether counsel was ineffective presents a mixed question of fact and law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Defendant failed to move for an evidentiary hearing or a new trial, so our review is limited to errors apparent from the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

A defendant's right to counsel guaranteed by the United States and Michigan Constitutions "encompasses the right to the effective assistance of counsel." *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022) (quotation marks and citation omitted); see also US Const, Am VI; Const 1963, art 1, § 20. "To establish ineffective assistance of counsel, a defendant must show

---

[8] Defendant also argues that the prosecution committed misconduct by repeatedly used "inflammatory language" and "denigrat[ing] [him] and his defense," but beyond the remarks identified above, defendant fails to point to anything specific in the record to factually support this claim. See *People v Mackle*, 241 Mich App 583, 604 n 4; 617 NW2d 339 (2000) ("A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim.").

(1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Shaw*, 315 Mich App at 672. "The effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Muniz*, 343 Mich App at 448 (quotation marks, citation, and alteration omitted). This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). That said, "a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citation omitted).

## A. FAILURE TO OBJECT TO PROSECUTION'S REMARKS

Defendant argues that defense counsel was ineffective for failing to object to the prosecution's improper remarks. We disagree. "[D]eclining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy," *Unger*, 278 Mich App at 242, and as previously discussed, the prosecution's remarks were largely unobjectionable under controlling standards and the trial court provided ameliorating instructions to the jury. On this record, defendant has not carried his "heavy burden" of demonstrating that counsel performed deficiently by failing to object or that, had counsel done so, there is a reasonable probability that the outcome of his trial would have been different. *Muniz*, 343 Mich App at 448.

## B. FAILURE TO CONSULT OR CALL AN EXPERT WITNESS OR TO CONDUCT AN ADEQUATE INVESTIGATION

Defendant also argues that defense counsel was ineffective for failing to consult or call an expert witness to address his state of mind before and during the crash because his second-degree murder conviction hinged on whether his actions were intentional. The record in this case, however, clearly indicates that defense counsel did, in fact, consult an expert. Defense counsel stated at a pretrial hearing that he had already discussed with an anticipated expert witness both the facts of the case and the possibility of testifying at trial, and he asked for an adjournment of trial to further consult with the anticipated expert.

In general, a defense attorney's decision whether to retain an expert witness is a matter of trial strategy, which we will not use the benefit of hindsight to second-guess. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The record reflects that defense counsel's trial strategy was to argue that the victim's death was accidental by emphasizing that defendant fled because he was in fear for his life and was therefore unable to recognize the risks associated with his actions. Defense counsel spent the bulk of cross-examination and closing argument establishing that defendant was so afraid for his own life that he fled the gas station out of pure instinct and was unable to recognize the risk associated with his conduct due to his heightened state of fear. Defense counsel also spent nearly all of defendant's direct examination questioning defendant about whether he recognized the men at the gas station as police officers, why he fled the gas station, and whether the victim's death was intentional. While defendant maintains that expert testimony regarding his state of mind would have strengthened this line of defense, he has offered nothing to substantiate this position or the notion that counsel performed deficiently by not

presenting such an expert at trial.[9]  See, e.g., *People v Blevins*, 314 Mich App 339, 351; 886 NW2d 456 (2016) ("Although defendant believes that additionally presenting an expert . . . would have been helpful, and defendant may even be right, that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel's performance was deficient.").

Along similar lines, defendant argues that defense counsel's failure to consult or call an expert witness resulted from an incomplete investigation.  "Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," but conducting a "less than complete investigation" before making a strategic decision can amount to ineffective assistance.  *Trakhtenberg*, 493 Mich at 52-53 (quotation marks and citations omitted).  As previously noted, however, the record indicates that defense counsel explored the possibility of an expert witness prior to trial, but ultimately decided not to call such a witness at trial.  Instead, defense counsel put significant effort into demonstrating, through cross-examination and defendant's direct examination, that defendant did not recognize the men at the gas station as police officers, only fled because he was afraid for his life, and did not intend to cause the victim's death.  There is no basis to conclude that defense counsel's decision not to present an expert witness resulted from an inadequate investigation.  See *id*. at 52.

Lastly, even if defendant did show that defense counsel performed deficiently for any of the claimed reasons, he has failed to show prejudice.  The prosecution presented data from the Challenger's event data recorder, significant photo and video evidence of the events before, during, and after the crash, and testimony from several witnesses, including the victim's eldest daughter, a motorist who witnessed the crash, a medical examiner, and multiple investigating officers.  All of this evidence established that defendant deliberately fled from the police at the gas station, drove the Challenger approximately 50 miles per hour above the posted speed limit, ran a red light, and crashed into the victim's Trailblazer while traveling at approximately 80 miles per hour, which caused the victim's fatal injuries and the severe injuries of her eldest daughter.  Defendant also took the stand and admitted that he did not have a driver's license at the time, fled from the gas station, and crashed into the victim's car while fleeing.  Defendant had ample opportunity to testify about his state of mind at the time that he fled from the gas station and crashed into the victim's car, which was the focus during his direct examination.  And as noted, defendant has not made any offer of proof regarding any expert witness who would favorably testify about his state of mind at the time of the crash.  See *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018) ("Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial.").  Thus, defendant has failed to establish that there is a reasonable probability that, but for

---

[9] Defendant attached several documents to his Standard 4 brief, including an affidavit from his mother, as appellate offers of proof, in an effort to show that defense counsel was ineffective for failing to consult or call an expert witness and that he suffered prejudice as a result.  The attached documents, however, clearly relate to an expert in crash reconstruction rather than an expert in a field who could address defendant's state of mind at the time of the crash.  Indeed, defendant provides no offer of proof, and otherwise makes no argument, identifying what type of expert could provide such testimony or what testimony the identified expert could provide in his favor.

defense counsel's claimed error(s), the result of the proceedings would have been different. See *Shaw*, 315 Mich App at 672.

Affirmed.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Philip P. Mariani